IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

DAVID EDWARD FOSTER,

             Petitioner,

                                    Case No. 3:06-689-ST

         v.

                                    FINDINGS AND RECOMMENDATIONS

STATE OF OREGON and FRANK
THOMPSON,

             Respondents.


    Amy Baggio, Assistant Federal Public Defender
    101 S.W. Main Street, Suite 1700
    Portland, Oregon 97204

          Attorney for Petitioner

    John R. Kroger, Attorney General
    Jacqueline Kamins, Assistant Attorney General
    Department of Justice
    1162 Court Street NE
    Salem, Oregon 97310

          Attorneys for Respondents


1 - FINDINGS AND RECOMMENDATIONS

STEWART, Magistrate Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of his underlying state court convictions for Assault and Criminal Mischief. For the reasons that follow, the court should deny petitioner's Motion to Amend his Second Amended Petition for Writ of Habeas Corpus (docket #112) and also deny his Second Amended Petition for Writ of Habeas Corpus (docket #70).

## BACKGROUND

On December 21, 1999, petitioner was home alone with his six-week-old daughter, BF, who suddenly went limp and became unresponsive. This prompted petitioner to go upstairs to his mother's residence for help.

Petitioner's mother, Linda Foster, called 911 and was giving BF rescue breaths when paramedics arrived minutes later. Trial Transcript p. 26.[1] One of the 911 responders, Brian Waddington, took BF and determined she did not have a pulse and was not breathing. While trained in administering CPR, he had never attempted to resuscitate an infant. *Id* at 41. Waddington testified that he performed "very light" chest compressions using two fingers. *Id* at 29-33. Thereafter, BF's pulse returned and she

---

[1]  Each page of the Trial Transcript has two sets of numbers. The court's reference to the Transcript is to the numbers located on the bottom of each page and prefaced with "TR."

began gasping for air, prompting the paramedics to administer oxygen through the use of a bag valve mask. *Id* at 33-35.

Although BF had sustained no visible external injuries, she suffered from seizures, retinal hemorrhaging, subdural hemorrhaging, and 18 fractured ribs. As petitioner was alone with BF at the time she nearly died, and as BF had no external physical injuries, authorities theorized that petitioner had shaken her, resulting in Shaken Baby Syndrome.

Petitioner told a Coos Bay police officer that after feeding BF, she suddenly went limp, and he "shook her" but then corrected himself, saying, "well, not really shook her, just like a little to see if she was sleeping." *Id* at 114-15. He maintained that he had done nothing to harm BF, only that he had been "burping" her when she went limp in his arms. When BF did not wake up, petitioner realized there was a problem and initiated rescue breaths before going upstairs to his mother's apartment for help. *Id* at 115.

Petitioner was questioned at Oregon Health Sciences University ("OHSU") by a Multnomah County Sheriff's Deputy where he asserted that he never shook BF in any way and remained steadfast in his position even when accused of lying. *Id* at 178-79, 181-82. The State ultimately charged petitioner by information with Assault in the Second Degree, Criminal Mistreatment in the First Degree, and Assault in the Third Degree. Respondent's Exhibit 102.

The case proceeded to a jury trial where the State called four medical experts.  The testimony showed that upon her arrival at the hospital in Coos Bay, BF was seen by Dr. Barbara Gabert who did not find any outward signs of trauma, but by this time BF was experiencing seizures.  Trial Transcript, pp. 351, 353.  A CT scan showed "several scattered episodes of bleeding inside [her] head." *Id* at 354-55.  According to the radiologist's written report, the areas of fluid between the skull and the brain represented acute bleeding that was recent, "minutes, hours, days.  Not weeks and months."  *Id* at 79-80.  Dr. Gabert testified that BF's "presentation was consistent with a shaken baby syndrome, thrown on the bed syndrome, one or the other." *Id* at 355.

Dr. Joseph Morgan, BF's pediatrician, had examined BF on three different occasions (at birth, the day after birth, and at the two-week checkup) prior to December 21, 1999, and each time found her to be a normal and healthy baby.  *Id* at 66-72.  On December 21, 1991, he took over BF's care after reviewing the CT scan and, based on BF's intracranial bleeding, transferred her from Coos Bay to Doernbecher Children's Hospital in Portland for examination by pediatric neurosurgeons.  *Id* at 80, 81, 355, 357-58.  He testified that he had never seen intracranial bleeding in an infant except in cases with some sort of trauma or injury.  *Id* at 81.  While he was unable to pinpoint exactly when BF's intracranial bleeding began, he testified that it was possible that it could have happened two

hours before he diagnosed it, or "as much as a day or so before." *Id* at 93.

The State also introduced the testimony of Dr. Phillip Silverberg, a pediatric radiologist at Doernbecher Children's Hospital. He testified that the December 21, 1999 CT scan showed swelling in BF's brain and extra axial fluid around the brain. *Id* at 248-49. Due to the lack of external trauma to the head, he opined that the trauma to the brain was most likely caused from a shaking injury, although such brain trauma could also exist following suffocation, cardiac arrest, or "a big, big stroke." *Id* at 439, 441-42.

Since BF's delivery had involved vacuum extraction, Dr. Silverberg addressed the issue of birth trauma. He testified that BF's brain trauma could not have been caused by birth trauma, even when involving the use of vacuum or forceps. Instead, "[y]ou can get this appearance after a very severe trauma like a big fall from a ten-story building or from a severe motor vehicle accident. . . ." *Id* at 459. He found it significant that the damage to BF's brain fibers did not show up on the original MRI, supporting his conclusion that these injuries did not occur at birth. *Id* at 507-08. He also noted that BF's brain swelling was not consistent with birth trauma because "that type of swelling is not consistent with a baby surviving for six weeks." *Id* at 508.

Dr. Silverberg also testified that BF's rib fractures could not have come from the CPR administered on December 21, 1999:

> So, basically, rib fractures occur from abuse. It's really rib fractures occur with the mechanism of abuse with the hands kind of around the baby and the fingers pushing and squeezing on the spine, which, then, buckles and fractures the rib from abuse, from car accidents, from severe trauma. But as far as the medical literature goes, posterior rib fractures do not occur with CPR.

*Id* at 484.

At the conclusion of Dr. Silverberg's direct examination, the following exchange took place:

> Q:    Doctor, is it your medical opinion that the fractures that [BF] had, especially, those on the posterior region of the ribs are the result of intentional child abuse?
>
> A:    Yes, I believe, that they're due to inflicted injury.
>
> Q:    And do you describe the inflicted injury as being consistent with compression and shaking?
>
> A:    Correct.  Yes.

*Id* at 485.

The State also called Dr. Joseph Zenel, an assistant professor of pediatrics at OHSU and the medical director of the Suspected Child Abuse and Neglect Team at Doernbecher. Dr. Zenel testified that "the story of the sudden stop breathing, the intracranial bleeding and this child having a history of not breathing, a pulse down and having seizures, we knew that we had a significant problem with that child's brain and that child abuse was a very good

6 - FINDINGS AND RECOMMENDATIONS

certainty." *Id* at 518.  His preliminary assessment was that BF was "severely shaken.  This was a child with shaken infant syndrome as we call it." *Id* at 527.  His final assessment was that BF "was the victim of shaken infant syndrome and that she presented at the time with – she had very, very recent injuries and that she was symptomatic from the moment that injury occurred." *Id* at 536.  He concluded that the symptoms manifested themselves in the immediate aftermath of the shaking as evidenced by: (1) the fresh rib fractures; (2) the fresh retinal hemorrhages; and (3) the fact that BF went from a "very normal neurologic functioning infant to suddenly having breathing problems and seizures." *Id* at 542. Dr. Zenel ultimately testified that he was 100% certain that BF was the victim of child abuse by violent shaking.  *Id* at 546.

Petitioner was represented at trial by Mark Hendershott and Margaret Melvin-Davidson.  The defense intended to focus on a non-criminal, medical explanation for BF's symptoms, as well as on testimony from petitioner's family and friends that he is a gentle and proud father.  *Id* at 385-411, 499-505.  During opening statements, Ms. Melvin-Davidson informed the jury that BF's delivery was complicated and involved vacuum extraction which could cause the hematomas she suffered.  *Id* at 837.  She also advised the jury that the defense would be calling its own expert, Dr. Karen Griest, to provide a non-criminal explanation for BF's injuries. *Id* at 836-37, 842-43.

7 - FINDINGS AND RECOMMENDATIONS

Petitioner testified in his own defense and was generally consistent with the interviews he provided to medical personnel and law enforcement authorities in both Coos Bay and in Portland.

Mr. Hendershott and Ms. Melvin-Davidson ultimately elected not to call Dr. Griest to testify. Dr. Griest had sent counsel an opinion letter approximately six months prior to trial stating that BF's injuries were consistent with birth trauma and that the rib fractures were likely caused from the CPR administered on December 21, 1999. Respondent's Exhibit 113, Att. 2. She arrived in Coos Bay on the second day of petitioner's trial and, after hearing the State's experts testify, informed counsel that they should not call her to testify because she would have to agree with the State's experts' testimony that it was "far more likely that this baby was shaken." Respondent's Exhibit 130, p. 33; Respondent's Exhibit 128, pp. 10-11. As a result, petitioner's counsel did not her or any other expert to testify at trial.

In closing argument, the State focused on the medical evidence and lack of a defense expert witness:

> They told you about a defense expert. They told
> you about [a] defense expert who's going to come
> and tell you some very important things. They told
> her name was Karen Greist [*sic*] and they're not
> going to be talking too much about Karen Greist
> (sic) when they get up for closing arguments. You
> didn't hear any other medical testimony. You
> didn't hear any evidence from any other medical
> expert in this case. And no matter what they say
> when they stand up and they give you their closing
> arguments, that does not change the fact there is
> insurmountable, physical evidence to support the

> diagnosis of child abuse. No matter what they say.
> Dr. Zenel is positive 100 percent certain and
> positive that on December 21st, 1999, at the time
> that [BF] became symptomatic, the minute before she
> was shaken. On that day he said he was certain
> that she was shaken and he's the only one with her
> and there is no evidence to the contrary and
> there's nothing that they can say that will change
> that.

Trial Transcript, pp. 735-36.

The defense focused its closing argument on the fact that BF

may have had an undiagnosed medical condition causing a seizure

which, in turn, may have led petitioner to panic and shake her:

> What happened here in view of the evidence would be
> that [petitioner] didn't act knowingly, he acted in
> a panic. He did what he thought at the time was
> reasonable and necessary because the child had
> passed out in his arms.
>
> Dr. Silverberg may have given the answer; the
> State's own witness. Remember? He sat . . . up
> here, we talked about a lot of different things and
> right at the close of the State's Redirect
> Examination in response to the question I, now,
> forget, his answer was maybe a parent in a panic
> could shake a baby and cause these injuries. There
> may be your answer, ladies and gentlemen. That may
> be your answer.

*Id* at 750.

In rebuttal argument, the State again focused on the absence

of any medical testimony from petitioner:

> You heard in the road map for the defense there was
> going to be this expert that was going to testify
> that CPR could cause all these things. She was not
> a witness, but she was in here as Dr. Silverberg
> was testifying, but she never got on the stand.
> These doctors were convincing. They were telling
> the truth and that they were drawing their opinions
> and inferences from the hard medical evidence and

9 - FINDINGS AND RECOMMENDATIONS

> they were totally qualified to do that.  And you
> believed them and their expert believed them and
> that's why you didn't hear from her.  There's no
> other medical evidence in this case except what you
> heard from Dr. Silverberg and Dr. Zenel.

*Id* at 759.

The jury convicted petitioner of all three charges, and the trial court sentenced him to 70 months in prison and three years of post-prison supervision.[2]  Respondent's Exhibit 101.

Petitioner filed a direct appeal which he later voluntarily dismissed.  Respondent's Exhibits 103, 120.

Petitioner filed for post-conviction relief ("PCR") in Marion County which was denied.  Respondent's Exhibits 132-33.  The Oregon Court of Appeals affirmed the PCR trial court without opinion, and the Oregon Supreme Court denied review.  Respondent's Exhibits 137-38.

Petitioner filed his Second Amended Petition for Writ of Habeas Corpus on March 2, 2010, alleging the following grounds for relief:

> 1:  [Petitioner] alleges ineffective assistance of
> trial counsel . . . as follows:
>
> (a):  .  .  in handling the medical evidence,
> including promising an expert in opening statement
> but failing to deliver and in failing to present
> available expert testimony to prove a non-criminal
> source for BF's injuries . . .

---

[2]  It appears petitioner was released from custody on November 13, 2006, and his term of post-prison supervision expired on May 11, 2009.

(b): . . . [by failing] to object to the prosecutor's statement in closing argument that even the defense expert believed the state's experts and that is why the defense expert did not testify. The prosecutor's statements were completely inappropriate argument based on facts not in evidence and designed to bolster credibility of the prosecution's witnesses. . . .

(c): . . . for his handling of highly improper and inflammatory testimony by Services to Children and Families ("SCF") worker Karen Cummins. [Trial counsel opened the door to this testimony] by inquir[ing] of Cummins on cross-examination about [SCF's involvement in a separate] termination of parental rights ("TPR") proceeding . . . concerning the same alleged acts of abuse that formed the basis of [petitioner's] criminal charges. Cummins told the jury *inter alia* that based upon the evidence presented at that separate hearing, SCF concluded that [petitioner] abused his child. Trial counsel was ineffective for not only opening the door to the TPR proceeding, but also for failing to object to this inappropriate testimony and for failing to move for a mistrial. . . .

2: . . . [Petitioner] is actually innocent of [all convictions] because he never violently shook his daughter BF or caused her injuries. The prosecution's case was based almost exclusively on the testimony of its medical experts who relied on the existence of subdural hemorrhages, retinal hemorrhages, and rib fractures to support the claim of child abuse. The new evidence presented with this petition proves these symptoms were caused by non-criminal conduct.

Second Amended Petition (docket #70)(citations omitted).

On September 2, 2011, petitioner filed a Motion to Amend his Second Amended Petition (docket #112). The proposed Third Amended Petition seeks to add the following Claim 3 alleging that trial counsel provided ineffective assistance:

11 - FINDINGS AND RECOMMENDATIONS

> due to their failure to present available expert
> testimony to prove a non-criminal source for BF's
> injuries based on the newly presented evidence of
> innocence offered during the course of the federal
> habeas proceeding.

Respondent opposes the Motion to Amend on the basis that amendment would be futile. Respondent also asks the court to deny relief on the Second Amended Petition because: (1) Grounds 1(b) and 1(c) are procedurally defaulted, and petitioner is not able to excuse the default through a showing of actual innocence; (2) Ground 2 does not state a cognizable claim and is without merit; and (3) the state court's decision denying relief on Ground 1(a) was reasonable.

**FINDINGS**

I.  **Motion to Amend**

   A.  **Standards**

Pursuant to Fed. R. Civ. P. 15(a)(1), a party may amend its pleading once as a matter of course: (1) within 21 days of service of the pleading; or (2) within 21 days after service of a responsive pleading or a motion to dismiss, whichever is earlier. Otherwise, a plaintiff may amend his pleading only with the consent of the opposing party or with leave of the court. The propriety of a motion to amend is generally determined based on the following four factors: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party. *Griggs v. Pace*

*Am. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999); *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991).

**B.    <u>Analysis</u>**

In Ground 1(a), the Second Amended Petition alleges ineffective assistance of counsel "in handling the medical evidence, including promising an expert in opening statement but failing to deliver and in failing to present available expert testimony to prove a non-criminal source for BF's injuries." Because petitioner presented this claim to the PCR trial court and received a decision on its merits, its disposition is governed by 28 U.S.C. § 2254(d)(1). According to that statute, a federal court shall not grant habeas corpus relief unless adjudication of the claim in state court resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

In support of his Second Amended Petition, petitioner attempts to rely on new evidence which he did not present to the PCR trial court. Specifically, he claims that a decade after his conviction, experts have "evaluated the original medical evidence with an evolved understanding of the physiological symptoms BF experienced in 1999." Petitioner's Brief in Support of Second Amended Petition (docket #73), p. 2. He asserts that according to these experts, it

13 - FINDINGS AND RECOMMENDATIONS

is very unlikely that BF was shaken, but is more likely that she died as a result of medical problems suffered since birth.

Petitioner contends that he is actually innocent of his underlying conviction and seeks to utilize his new evidence to bolster the claim of ineffective assistance of counsel in Ground 1(a) of the Second Amended Petition.  In a footnote, he notes that "[i]t is an open question whether passing through [the gateway of actual innocence so as to excuse a procedural default] permits a petitioner to bolster the factual basis of exhausted claims with the newly presented evidence."  *Id* at 36 n. 12.

After petitioner filed his supporting memorandum, the Supreme Court issued its decision in *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388 (2011).  In *Pinholster*, the Court held that "review under [28 U.S.C.] § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" and that "evidence introduced in federal court has no bearing on § 2254(d)(1) review."  *Id* at 1398, 1400.  As a result, a federal habeas court cannot review the reasonableness of a state court decision in light of evidence the state court never heard.

In light of this clarification, petitioner has abandoned his attempt to supplement the record with new evidence to support Ground 1(a) and instead seeks to raise what he labels as a new claim.  As his proposed Ground 3, he alleges that his trial attorneys failed "to present available expert testimony to prove a

non-criminal source for BF's injuries based [on] the newly presented evidence of innocence offered during the course of the federal habeas proceeding." Proposed Third Amended Petition (docket #112), p. 5. He further alleges that "[t]he claim that his attorneys were ineffective in handling the medical evidence was raised in state court, but on a much more limited factual basis that the current federal habeas case." *Id.*

Petitioner is simply attempting to recast Ground 1(a) as a new claim in order to avoid *Pinholster's* prohibition against introducing new evidence in support of a claim decided on the merits in state court. Petitioner's proposed Ground 3 claim is simply a reiteration of Ground 1(a), except that it relies on new evidence that was not presented to the PCR trial court. Petitioner cannot circumvent the prohibition against relying on new evidence simply by alleging the same claim while attempting to rely upon new evidence. To conclude otherwise would render the recent *Pinholster* decision meaningless.

Because it would be futile to allow petitioner to amend his Second Amended Complaint to include his proposed Ground 3, his Motion to Amend should be denied.

## II. <u>Second Amended Petition</u>

### A. <u>Exhaustion, Procedural Default, and Actual Innocence</u>

A petitioner seeking habeas relief must exhaust his claims by fairly presenting them to the state's highest court, either through

15 - FINDINGS AND RECOMMENDATIONS

a direct appeal or collateral proceedings, before a federal court will consider the merits of habeas corpus claims pursuant to 28 U.S.C. § 2254. *Rose v. Lundy*, 455 U.S. 509, 519 (1982). The exhaustion doctrine is designed "to avoid the unnecessary friction between the federal and state court systems that would result if a lower federal court upset a state court conviction without first giving the state court system an opportunity to correct its own constitutional errors." *Preiser v. Rodriguez*, 411 U.S. 475, 490 (1973).

Petitioner concedes that Grounds 1(b) and 1(c) are procedurally defaulted, but argues that he can excuse this default through a showing of actual innocence. In *Schlup v. Delo*, 513 U.S. 298 (1995), the Supreme Court addressed the process by which state prisoners may prove "actual innocence" so as to excuse a procedural default. In order to be credible, a claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Id* at 324; *Downs v. Hoyt*, 232 F.3d 1031, 1040 (9th Cir. 2000), *cert. denied*, 532 US 999 (2001). The Ninth Circuit has held that "habeas petitioners may pass *Schlup's* test by offering 'newly presented' evidence of innocence." *Griffin v. Johnson*, 350 F.3d 950, 963 (9th

16 - FINDINGS AND RECOMMENDATIONS

Cir. 2003). "Newly presented" evidence is evidence that was not before the trial court. *Id.*

Ultimately, petitioner must prove that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Bousley v. United States*, 523 U.S. 614, 623 (1998); *Schlup*, 513 U.S. at 327; *Downs*, 232 F.3d at 1040.    In making this determination, this court "must assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup*, 513 U.S. at 332.

In assessing the adequacy of petitioner's showing, the court is not bound by the rules of admissibility that would govern at trial.    "Instead, the emphasis on 'actual innocence' allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial." *Id* at 327.    In making its determination on a claim of actual innocence, a federal habeas court must review all of the evidence, "including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial." *Id* at 328 (internal quotations omitted).

In rebutting petitioner's claim of actual innocence, respondent is not limited to the existing record and is permitted to present any admissible evidence of petitioner's guilt, even if

that evidence was not presented at trial. *See Bousley*, 523 U.S. at
624 (addressing state's rebuttal in guilty plea case).

Here petitioner presents new evidence in the form of a Policy
Statement by the American Academy of Pediatrics recommending that
the term "Shaken Baby Syndrome" be discontinued, as well as the
medical opinions of four new physicians who have evaluated the
medical records in this case and reached conclusions contrary to
those of Drs. Zenel and Silverberg. Petitioner's Exhibits G, J-L,
N-Q. Petitioner's experts generally assert that while BF's
injuries could have been caused by abuse,[3] they likely arose from
pre-existing medical conditions that were present at birth and grew
worse over the first six weeks of her life. In the Appendix to his
supporting memorandum, petitioner has helpfully summarized the main
differences between the testimony of the State's experts at trial
and the opinions of the experts proffered in this proceeding.

In response, the State introduces additional evidence that
BF's injuries were caused by abuse, including a new medical opinion
to that effect by Dr. Thomas Valvano. Respondent's Exhibit 139,
Att. 1. Respondent also provides a recent statement from Dr. Zenel
in which he maintains, even in the face of the competing expert

---

[3] Not only do petitioner's new experts hold this view, but
Dr. Griest's pretrial opinion letter also stated: "Certainly, it
is possible that [BF's] injuries were caused by violent shaking
at the hands of" petitioner. Respondent's Exhibit 113, p. 3.

18 - FINDINGS AND RECOMMENDATIONS

opinions offered by petitioner, that his trial testimony was accurate. Respondent's Exhibit 139, Att. 3.

Unlike the cases cited in his supporting memorandum, petitioner offers no exculpatory DNA evidence or recantation by a co-defendant to bolster his claim of innocence. Instead, he has established a difference of medical opinion between the various experts involved in this case. As illustrated below, this difference of medical opinion is not enough to show that no reasonable juror would have voted to convict him.

The record contains no medical evidence that BF was anything other than a healthy, normally-functioning infant until December 21, 1999, when she was admitted to the hospital with numerous rib fractures, retinal and subdural hemorrhaging, and seizures. The State has established that petitioner was alone with BF when she became symptomatic and has offered five medical experts who conclude that BF suffered trauma, likely from being shaken, immediately giving rise to her injuries and symptoms. Importantly, the four medical experts who testified for the State at trial were the only four physicians who personally dealt with and treated BF in 1999. They were not solicited by the State to posit a particular viewpoint, yet all of them reached the same conclusion that BF had been the victim of inflicted trauma (most likely shaking) which led to her injuries and symptoms.

19 - FINDINGS AND RECOMMENDATIONS

In contrast, petitioner now presents opinions from experts gathered over a lengthy period of time from around the country for the sole purpose of this litigation.  None of these experts ever treated BF, and even after reviewing these contrary positions, Dr. Zenel continues to remain steadfast in his medical opinion.  He specifically finds fault with their approaches on the basis that none of them look at the totality of the symptoms and injuries BF displayed when she was hospitalized in 1999 to reach a diagnosis and, contrary to the opinions of petitioner's new experts, he views the developments in the peer-review literature over the last 10 years as supportive of his trial testimony.  Respondent's Exhibit 139, Att. 3, p. 1.

Petitioner makes a strong showing that due to scientific advancements, medical views concerning Shaken Baby Syndrome have evolved significantly in recent years.  He also points out weaknesses in the opinions of the State's experts that were not exploited at trial, including: (1) evidence that shaking results in injuries which typically include thoracic, spine, and neck injuries which were not present in BF's case; (2) brain trauma and bleeding can initially be asymptomatic, but later develop into chronic subdural hematomas; (3) BF's injuries cannot be timed with precision and accuracy; (4) it is difficult to tell whether a subdural hematoma is acute or chronic; and (5) various experts

could conclude that the rib fractures BF suffered were due to a bone fragility disorder and not to abuse.

If this were a situation where science had evolved to the point that the old science used to convict petitioner was outdated and unreliable, then the outcome of the actual innocence inquiry might be different. However, this is not a situation where petitioner was convicted based on junk science. Instead, this is a situation where experts forcefully disagree regarding the validity of the differential diagnosis of Shaken Baby Syndrome which inherently involves a subjective judgment.

This is a troubling case. It is impossible to tell what really happened when petitioner was alone with his daughter on December 21, 1999. The court is faced with competing medical viewpoints and left to sift through the vigorous debate among medical experts over the shifting landscape of what constitutes Shaken Baby Syndrome or Abusive Head Trauma. The court is not in a position to resolve this academic debate which will no doubt continue. Instead, the court need only assess whether petitioner is actually innocent for purposes of *Schlup's* fundamental miscarriage of justice exception to procedural default. Based upon the totality of the evidence presented to this court, a rational factfinder could find the State's experts more persuasive and, thus, conclude that petitioner committed the crimes with which he

was charged.  As a result, petitioner is unable to excuse his default based on actual innocence.

Should the court require further elucidation of the medical evidence, petitioner requests an evidentiary hearing to further develop that evidence.  Any additional clarification pertaining to petitioner's medical evidence would not materially affect the disposition of his case.  Thus, his request for an evidentiary hearing should be denied.  *Gandarela v. Johnson*, 286 F.3d 1080, 1087 (9th Cir. 2002).

### B.  <u>Merits</u>

Petitioner's remaining claims allege that: (1) his trial attorneys were ineffective when they failed to properly handle the medical evidence, including their failure to provide expert testimony to prove a non-criminal source for BF's injuries as promised in their opening statement (Ground 1(a)); and (2) he is actually innocent and entitled to habeas corpus relief on this freestanding claim of innocence (Ground 2).  Because petitioner is not able to meet the *Schlup* gateway showing of actual innocence to excuse his procedural default, he is unable to meet the more demanding showing required by *Herrera v. Collins,* 506 U.S. 390, 417

(1993).[4] *House v. Bell*, 547 U.S. 518, 555 (2006) (*Herrera* requires more convincing proof of innocence than *Schlup*).

### 1.   **Standard of Review**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court's findings of fact are presumed correct, and petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). Under the "unreasonable application" clause, a federal habeas court

---

[4]   The court need not decide whether a non-capital habeas petitioner can allege a freestanding claim of actual innocence, an issue which remains an open question. *District Attorney's Office of Third Judicial Dist. v. Osborne*, 557 U.S. 52, —, 129 S.Ct 2308, 2321 (2009).

may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410. The state court's application of clearly established law must be objectively unreasonable. *Id* at 409.

### 2. <u>Analysis</u>

Petitioner contends that trial counsel failed to meet with Dr. Griest prior to trial, but nevertheless promised the jury during opening statement that she would testify on petitioner's behalf during trial. After doing so, counsel failed to present Dr. Griest or any other evidence tending to show non-criminal sources of BF's injuries.

Because no Supreme Court precedent is directly on point that corresponds to the facts of this case, the court uses the general two-part test the Supreme Court has established to determine whether petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S, 111, 122 (2009). First, petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption

that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 123.

The PCR trial court issued the following Findings of Fact and Conclusions of Law which specifically addressed petitioner's Ground 1(a):

<u>PCR Findings of Fact</u>

    13.  Mark Hendershott stated in his deposition that Dr. Griest informed him, after listening to the State's experts, that it would not be a good idea to have her testify as she would have to largely agree with the prosecution experts.

    14.  The victim suffered extensive injuries which the State's doctors concluded occurred just a day or two before December 21, 1999. Her injuries included 18 bone fractures.

15.  Petitioner failed to produce evidence that there was a non-criminal cause for [BF's] injuries.

16.  Margaret Melvin-Davidson testified that she, or her predecessor, Patricia Davis, supplied all pertinent information to Dr. Griest as it became available.

17.  Petitioner failed to produce evidence that there was an expert available who would have testified that all of [BF's] injuries could have been caused by non-criminal activity.

* * * * *

19.  Margaret Melvin-Davidson was a credible witness.

20.  Mark Hendershott was a credible witness.

21.  Petitioner was not a credible witness.

* * * * *

<u>PCR Conclusions of Law</u>

4.   Petitioner failed to prove that his defense attorneys acted unreasonably by deciding to not have Dr. Griest testify. Once Dr. Griest informed counsel that she would have to agree with the State's experts as to the cause of [BF's] injuries, it was not unreasonable for counsel to not call this expert.

5.   Based on the findings of fact set forth above, in the underlying criminal proceedings resulting in petitioner's conviction, petitioner was not denied the right to assistance of counsel, as guaranteed by either the United States Constitution and as articulated by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), or the Constitution of the State of Oregon

Respondent's Exhibit 132, pp. 5-7.

Petitioner takes issue with three of the PCR trial court's factual findings as unreasonable in light of the evidence presented. 28 U.S.C. § 2254(d)(2). He first challenges the factual finding as to trial counsel's handling of the defense expert. Specifically, he argues that Dr. Griest neither advised counsel not to call her nor informed them that she agreed with the State's experts, and that the PCR trial court's decision to the contrary is not supported by the record. Petitioner points to the PCR affidavits of Mr. Hendershott and Ms. Melvin-Davidson which both assert that it was a strategic decision not to call Dr. Griest as a witness for the defense. Mr. Hendershott's Affidavit described the decision as follows:

> After the expert witnesses for the prosecution testified, I decided not to call Dr. Griest as a witness for the defense. I made that decision because it was my opinion that the defense would be better served by addressing in my closing argument weaknesses that I perceived in the . . . testimony by the state's expert witnesses.

Respondent's Exhibit 110, p. 2.

Ms. Melvin-Davidson's Affidavit is similar:

> After the expert witnesses for the prosecution testified, Mr. Hendershott . . . made the decision not to call Dr. Griest as a witness for the defense. Mr. Hendershott indicated that he believed that the state's experts had been adequately cross-examined and that presentation of expert testimony by the defense would not be necessary.

Petitioner's Exhibit C, p. 3.

27 - FINDINGS AND RECOMMENDATIONS

Contrary to petitioner's argument, these statements are not inconsistent with their subsequent testimony during the PCR trial that Dr. Griest advised them not to call her because she agreed with the State's witnesses.  Mr. Hendershott could have decided to rely on his cross-examination of the State's medical experts after Dr. Griest informed him that her testimony would be damaging to the defense.  Dr. Griest's mid-trial change-of-heart would also explain why Mr. Hendershott's closing posited that petitioner may have shaken BF in a panic as was suggested by Dr. Silverberg.  Trial Transcript, p. 750.

While petitioner also points to Dr. Griest's Affidavit stating that she was prepared to testify consistently with the evaluation she sent to the defense in July of 2000, the PCR trial court credited Mr. Hendershott's version of events as credible.  Such a credibility determination must be accepted by a federal habeas corpus court absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1).  Petitioner has not offered clear and convincing evidence sufficient to overcome the PCR trial court's factual finding.

Petitioner also argues that the PCR trial court ignored the evidence and improperly concluded that he failed to produce evidence that an expert was available to testify to a non-criminal source for all of injuries.  He argues that the evidence before the

PCR trial court showed that both Dr. Griest and Dr. Ronald J. Jollo were available to testify on his behalf.

As previously discussed, Dr. Griest informed Mr. Hendershott that he should not call her as a witness. As a result, it was not unreasonable for the PCR trial court to also conclude that Dr. Griest was unavailable to testify.

Dr. Jollo submitted an affidavit during the PCR trial stating that while retinal hemorrhaging is one of many signs said to be consistent with Shaken Baby Syndrome, his review of the literature shows that there is no consensus as to whether there is a nexus between such hemorrhaging and Shaken Baby Syndrome. Respondent's Exhibit 114. He did not purport to have reviewed a single document within BF's medical file and did not speak to any aspect other than retinal hemorrhaging. Instead, he simply attested that retinal hemorrhaging, alone, is "generally of little, if any, diagnostic value in a case in which an infant may have been shaken." *Id* at 1-2. His Affidavit does not address an instance in which the retinal hemorrhaging is also accompanied by subdural hematomas, seizures, and many anterior and posterior rib fractures as was the case here. As a result, the PCR trial court's finding that petitioner failed to produce evidence that an expert was available to testify as to a non-criminal source for all of BF's injuries was not unreasonable.

///

29 - FINDINGS AND RECOMMENDATIONS

Finally, petitioner asserts that the PCR trial court's factual findings simply do not make any sense. He specifically points to the finding that BF's injuries occurred a day or two prior to December 21, 1999. Respondent's Exhibit 132, p. 6. According to petitioner, this would mean her injuries occurred one to two days before she was admitted to the hospital. This court construes the PCR trial court's finding to mean that BF was injured within 48 hours of the time she became symptomatic. Thus, the injuries were very recent and not the result of any trauma she experienced at birth. This finding is consistent with the evidence adduced at the underling criminal trial. Trial Transcript, pp. 79-80, 93. As a result, it is not an unreasonable factual finding given the totality of the medical evidence presented to the PCR trial court.

Petitioner also argues that the PCR trial court unreasonably applied *Strickland* to the facts of his case when it denied relief on Ground 1(a). This court's review of Ground 1(a) is limited to the evidence which was presented to the PCR trial court. *Pinholster*, 131 S. Ct. at 1398, 1400.

Petitioner first argues that counsel failed to properly prepare Dr. Griest by failing to meet with her in person or providing her with images of BF's retinal hemorrhaging prior to

///

///

trial.[5]   The PCR trial court found Ms. Melvin-Davidson credible when she testified that she and her predecessor, Patricia Davis, supplied all pertinent information to Dr. Griest as it became available.   While petitioner points to instances in the PCR record where counsel was unsure as to whether Dr. Griest was provided with the images of BF's retinal hemorrhaging,[6] the bulk of the record supports the PCR trial court's factual finding on this point.

Dr. Griest's opinion letter to counsel in July 2000 prior to trial shows that she had reviewed the relevant evidence and was able to provide an informed opinion.   Respondent's Exhibit 113, Att. 2.   That letter expressly states that trial counsel had provided her with "the medical records of [BF] including the well-baby and birth records; the police reports; photographs of [BF] in a natural setting; a video tape of [BF]; the CT scans of [BF]; the MRIs and radiographs of [BF]; the nuclear bone scan; a transcript of a juvenile dependency hearing; and a transcript of the 911 call."   *Id* at 1.   It also specifically discusses retinal hemorrhaging.   *Id* at 2.   Moreover, it is dated six months prior to trial, indicating that Dr. Geist was provided with all of the documentary evidence she needed well in advance of the trial.

---

[5] This argument contradicts petitioner's assertion that Dr. Griest was available and willing to give material and effective testimony to help petitioner's case.

[6] Respondent's Exhibit 128, pp. 16, 39.

31 - FINDINGS AND RECOMMENDATIONS

Petitioner also argues that trial counsel erred by not calling Dr. Griest to testify after advising the jury of her forthcoming testimony during the opening statement. The evidence before the PCR trial court showed that counsel had retained Dr. Griest to provide expert testimony on petitioner's behalf and to explain how BF could have sustained her injuries in the absence of any criminal conduct on petitioner's part. Based on her review of the medical records, she stated that BF's "chronic subdural hematomas were consistent with birth trauma that she had experienced, namely vacuum extraction. In turn, the subdural hematomas could have caused the seizures that [BF] experienced." Respondent's Exhibit 113, p. 2. She also stated that while BF's rib fractures could have been the result of abuse, on rare occasions those could be caused by CPR, but felt that BF's case was likely one of those rare cases. *Id*, Att. 2. Ms. Melvin-Davidson relied on this opinion during the opening statement when she described how Dr. Griest would testify.

In the midst of the trial, Dr. Griest informed Mr. Hendershott that the defense was better served by not calling her because she found the State's experts persuasive. Respondent's Exhibit 130, p. 33; Respondent's Exhibit 128, pp. 10-11. At that point, it was too late for trial counsel to find and retain a new expert, and they simply had to proceed without calling Dr. Geist who might have irreparably damaged their case. The fact that Dr. Griest changed

her opinion mid-trial distinguishes this case from those cases cited by petitioner regarding attorney decisions not to present expert witnesses for their clients.   Indeed, had trial counsel elected to call Dr. Griest in such a situation, and had she testified as she advised Mr. Hendershott she would, their performance would have fallen below an objective standard of reasonableness.   When they did not call her, they made a sound decision to protect their client's interests, given the totality of the circumstances they faced.  As a result, the decision of the PCR trial court denying relief on Ground 1(a) did not result in an unreasonable application of clearly established federal law.

///

///

///

///

///

///

///

///

///

///

///

///

///

## RECOMMENDATIONS

For the reasons identified above, petitioner's Motion to Amend his Second Amended Petition for Writ of Habeas Corpus (docket #112) and the Second Amended Petition for Writ of Habeas Corpus (docket #70) should be DENIED. The court should enter a judgment dismissing this case with prejudice, but Certificate of Appealability on the basis that petitioner has made a substantial showing of the denial of a constitutional right pursuant to 28 U.S.C. § 2253(c)(2).

## SCHEDULING ORDER

The Findings and Recommendation(s) will be referred to a district judge. Objections, if any, are due April 5, 2012. If no objections are filed, then the Findings and Recommendation(s) will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation(s) will go under advisement.

DATED this 20th day of March, 2012.

s/  Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

34 - FINDINGS AND RECOMMENDATIONS